SHAWN HALBERT (CA SBN 179023)
Law Offices of Shawn Halbert
214 Duboce Avenue
San Francisco, CA 94103
Telephone: (415) 515-1570
Email: shawn@shawnhalbertlaw.com

*Attorney for Defendant*
JAIR RAMIREZ-CASTILLO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAIR RAMIREZ-CASTILLO<br><br>Defendant. | **Case No.:** CR 4:23–00239 HSG<br><br>DEFENDANT'S SENTENCING MEMORADUM<br><br>Date:  January 22, 2025 at 10:00 a.m. |

**INTRODUCTION**

    Why did Jair Ramirez-Castillo, a man with no criminal history who had lived in poverty with his family in Honduras for his entire life, risk his life to travel from Honduras to the United States and across the United States border and ultimately to the Bay Area, where after unsuccessfully looking for legal work, he ended up selling fentanyl in San Francisco while living in a cramped room in Oakland? For similar reasons that impoverished people all over the world do things that have negative social or environmental consequences – men in South Africa who go a mile below the ground to illegally mine for gold, displaced farmers in Brazil who clear pieces of the Amazon rain forest. People, like Mr.

-1-

**SENTENCING MEMORADUM**
**CR 4:23-00239 HSG**

Ramirez-Castillo, who commit these crimes that have social harms do so not because they are bad or immoral, but because they are completely desperate, responding to a demand for what they do.

The defense fully joins with the other parties in recognizing that fentanyl is dangerous and a scourge on society. The defense agrees that selling and using fentanyl are harmful acts, and understands that they must be punished and deterred. Mr. Ramirez-Castillo is deeply ashamed of his conduct and sincerely regrets it. At the same time, it would be a mistake and binary thinking to attribute an outsized role to Mr. Ramirez-Castillo in the crisis of fentanyl use and abuse. He is a cog in a much larger machine. In that sense, he is in some senses also a casualty of the drug trafficking trade. He loved school and wanted to be a mechanic. But instead, due to the economics and crime in Honduras, the appetite for fentanyl on the streets of San Francisco, and the activity of large-scale fentanyl producers and traffickers, he ended up on Seventh Street in San Francisco selling fentanyl. He never wanted to leave Honduras, and even having to leave Honduras, he would have loved a legal job – moving furniture, being mechanic or a roofer or any other number of jobs at which he could have made more money than he did selling fentanyl.

The guidelines in this case are driven entirely by the quantity of fentanyl for which Mr. Ramirez-Castillo is being held accountable. But the undisputed evidence is that the quantity is fortuitous, dependent only on how much the government informant requested and how many times he requested it before the government decided to arrest Mr. Ramirez-Castillo. This is *not* a case in which Mr. Ramirez-Castillo was selling similarly large quantities to any other person; the larger amounts were driven one hundred percent by the informant and law enforcement. This is confirmed by the evidence in this case. Mr. Ramirez-Castillo was a small-time drug street-level seller who, like so many others in his situation, was selling fentanyl on Seventh Street in San Fransico. Like other low-level drug dealers, Mr. Ramirez-Castillo had a supplier would refill his small supply when it ran out.  When the informant contacted Mr. Ramirez-Castillo to buy far larger quantities than he had ever sold before, he simply got more in order to sell to the informant. And what this court now knows, and Mr. Ramirez-Castillo understood from his supplier whom has been sentenced by this court, is that the quantity was increased simply by adding

-2-

**SENTENCING MEMORADUM**
**CR 4:23-00239 HSG**

filler (which Mr. Ramirez-Castillo did not even have himself, as he was at such a low level on the totem pole). Because the quantity of fentanyl at issue in this case was driven completely by the amounts set by the informant, Mr. Ramirez-Castillo's situation is far more akin to the people arrested selling fentanyl on Seventh Avenue, who are given a fast-track deal and sentenced to time served.

At its core, the question is not whether Mr. Ramirez-Castillo should be punished. He has been punished. He has suffered a felony conviction, he has been incarcerated at Santa Rita Jail for almost a year and a half, and he will be deported back to Honduras, from where he has received death threats because multiple people incorrectly believe that he is responsible for the arrest of his co-defendant and other people who were intercepted on the phone line he was using. Thus, the only question is how much he needs to be punished. The defense asks this court to find that it does not need to impose any additional punishment to accomplish the purposes of sentencing.

## ARGUMENT

**A. Applicable Law**

   1. <u>Courts Do Not Presume that the Guidelines Sentencing Range is Reasonable</u>

As this court of course knows, *United States v. Booker*, 543 U.S. 220 (2005) and its progeny do "not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). The Supreme Court emphasized that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply" and that "the Guidelines are not only not mandatory on sentencing courts, *they are also not to be presumed reasonable.*" *Id.* at 352 (emphasis added). Courts must calculate the sentencing guidelines range and then, but then determine what sentence is actually appropriate for the specific individual in light of the 18 U.S.C. §3553(a) factors. *Id.* After determining the advisory sentencing range, district courts must consider the factors specifically identified in 18 U.S.C. § 3553(a) before imposing a sentence. *See Cunningham v. California*, 549 U.S. 270, 286-87 (2007).

-3-

**SENTENCING MEMORADUM**
**CR 4:23-00239 HSG**

2. Courts must Apply the 3553(a) Factors to Impose the Shortest Sentence Possible that Satisfies the Purposes of Sentencing

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a). When determining the appropriate sentence for an individual defendant, a district court should impose the *shortest* sentence possible that (1) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense; (2) deters future criminal conduct; (3) protects the public from the defendant; and (4) provides the defendant with the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2) (described as "the parsimony provision." *United States v. Jimenez-Beltre*, 440 F.3d 514, 525 & n.8 (1st Cir. 2006)).

B. Relevant Facts

As is set out in the report by U.S. Probation, Mr. Ramirez-Castillo was born and raised with his two older sisters in Honduras, by his parents. He grew up in poverty, living in a space with one bedroom for five people. PSR ¶ 52. He primarily ate rice, beans and tortillas and would often go hungry, being without food for three or four days at a time. *Id.* He was able to finish the equivalent of high school in Honduras and was interested in furthering his studies and in being mechanic, but he was not financially able to do so. PSR ¶ 54. Thus, he worked in farming in Honduras.

Mr. Ramirez-Castillo came to the United States only after his father had an accident and hurt his leg such that he was unable to continue to work. PSR ¶ 54. Otherwise, Mr. Ramirez-Castillo did not want to leave his small town in Honduras, doing so only because of his father's condition and the need to help his family out financially. *Id.* The journey to the United States (through El Salvador, Guatemala and Mexico) was perilous. It took him two months and was dangerous; his experiences included seeing several people being killed and being robbed on two separate occasions by men with firearms. PSR ¶ 53.

After unsuccessfully trying to find legal employment, PSR ¶ 61, Mr. Ramirez-Castillo became a street-level seller of narcotics on Seventh Street in San Francisco. Mr. Ramirez-Castillo took part in

three drug sales of fentanyl to a government informant, after the person who had previously sold fentanyl to the informant left town and passed along the informant-client to Jair Ramirez-Castillo. As is set out in the Probation Report, Mr. Ramirez-Castillo is being held accountable for the quantity of drugs in three drug sales, in January of 2023, March of 2023, and July 2023. In each case, the sale was initiated by the informant, and the informant determined the drug quantity that was sold (eight ounces for $3,200 in January and in March, and 12 ounces and then 8 ounces on the same day in July, 2023).

       The only reason that law enforcement did not arrest Mr. Ramirez-Castillo in January 2023 is that they wanted to do more deals in order to figure out who was selling him the fentanyl. The government obtained a wiretap of Mr. Ramirez-Castillo's phone before setting up the July 21, 2023 sale so that they could learn more about whom he was communicating with. That wiretap did not reveal anyone who was buying the type of quantity in  of suspected fentanyl, in exchange for $3,200, on both occasions. Phone location data showed that Mr. Ramirez-Castillo drove into San Francisco multiple days per week to work as a street-level dealer.

       Mr. Ramirez-Castillo did not have any social life to speak of and disliked living in Oakland, which was nothing like the small town in Honduras where he had spent his entire life. Thus, when he was not on Seventh Street in San Francisco, Mr. Ramirez-Castillo confined himself to a small, dank apartment in Oakland. PSR ¶ 53. He shared this apartment with one other person, whom indicia in the apartment also indicated sold fentanyl. Photographs of the apartment taken at the time of the execution of the search warrant show a very small, run-down, decrepit room where Mr. Ramirez-Castillo lived, his mattress several feet away from the man with whom he lived. *See* Ex. A. This was not a home or a place that Mr. Ramirez-Castillo experienced any pleasure in inhabiting; it is where he spent his spare time, not even going out with friends or talking walks and such. Nor was he spending money on himself; rather he simply met his basic expenses.

    He sent all of the money he made back to his family in Honduras, which was approximate $900-$1,000 per month. PSR ¶ 53.

-5-

**SENTENCING MEMORADUM**
**CR 4:23-00239 HSG**

**C. Bases for a Sentence of Time-Served (which is the Equivalent to Approximately 19.5 Months)**

The defense requests a prison sentence of time-served, which given the amount of time that Mr. Ramirez-Castillo has been in custody, is the equivalent to a sentence of 19.5 months. There are several reasons why this sentence is sufficient to meet the goals of sentencing in this case.

First, as this court is aware, the government has a fast-track policy in the U.S. Attorney's Office whereby street-level dealers are offered (and essentially always accept, which Ramirez-Castillo would have) immediate sentencing and deportation. The defense understands why the government did not offer Ramirez-Castillo the fast-track deal, as he was not, literally, arrested on the street during a federal sweep. However, there is no real debate about the fact that a street-level dealer is what Mr. Ramirez-Castillo was, and other than the times he was selling to the informant, that is what he was doing. He has already served substantially more time than a defendant receiving a fast-track offer.

Second, the guidelines in this case are driven almost exclusively by drug quantity. But law enforcement (via the informant) had complete control over the quantity of fentanyl that Mr. Ramirez-Castillo obtained from his supplier to sell. If the informant had asked for four ounces, he would have sold four ounces rather than eight ounces. This might not be relevant if the Mr. Ramirez-Castillo was selling similar drug quantities to other people, but he was not. Further, not only did law enforcement set the quantities through the informant, but it controlled the number of times that Mr. Ramirez-Castillo sold to the informant. Agents could have arrested Mr. Ramirez-Castillo in January, 2023, but (understandably) wanting to find out who was supplying the fentanyl, they arranged sales on three different days from January – July, 2023, with two sales on the last day so that they could verify his supplier. The defense does not fault the government for doing this, as it was pursuing its law enforcement objectives. However, this means that the quantity of fentanyl for which Mr. Ramirez-Castillo is legally responsible was determined *only* by the informant and law enforcement.

If, for example, law enforcement had arrested Mr. Ramirez-Castillo after the first sale to the informant, the starting Offense Level would have been 26 rather than 30 (8 ounces = 226.8 grams plus

-6-

SENTENCING MEMORADUM
CR 4:23-00239 HSG

26 grams found in apartment = 252.8, which falls in the 160-280 grams range of OL 26); his final offense level would have been 19, with a resulting guideline range of 30-37 months. Had the informant asked to buy 5 ounces rather than 8 ounces in January, 2023, the offense level would be two lower still, with a final guideline range of 24-30 months. Similarly, as the court now knows and as Mr. Ramirez-Castillo understood at the time, the way that his supplier was getting larger quantities of fentanyl was to add cutting agents. Certainly, there is an argument that this presents a danger in itself because in theory it means more fentanyl (in practice, it was simply going to an informant/law enforcement). But is also the case that the offense level is based on drug quantity. So the fact that Mr. Ramirez-Castillo's supplier transformed a small amount of fentanyl into a larger amount in order to sell to the informant means that the practical result is that a much smaller amount (with a much lower offense level) becomes an amount with a much higher offense level.

Third, another basis for variance is the relative culpability of co-defendants. The person who has admitted to supplying Mr. Ramirez-Castillo with the relevant fentanyl was sentenced by this court to forty-six months in custody. He was also convicted of money laundering for sending drug money (other than his own earnings) to Honduras. The defense is certainly not trying to vilify Mr. Ramirez-Castillo's supplier, who was subject to many of the same socio-economic pressures as Mr. Ramirez-Castillo, but it is a basic legal principle of sentencing that prison sentences should reflect relative culpability. Under that analysis, Mr. Ramirez-Castillo's sentence should be at least less than half of his co-defendant who was supplying him with the fentanyl (and providing the means for turning a smaller amount of fentanyl into a larger quantity).

Fourth, there is extensive social science demonstrating that a longer prison sentence is often not necessary to punish a person, as it is often the conviction and a prison sentence itself that is adequate for punishment. In this case, not only has Mr. Ramirez-Castillo (a person with no criminal record) been convicted of a federal felony and served almost a year and a half at Santa Rita Jail (the equivalent of a 19.5 BOP sentence), but he will be deported to Honduras at the conclusion of his sentence, with no chance of ever getting any immigration relief in light of his conviction. Further, because of the federal

-7-

SENTENCING MEMORADUM
CR 4:23-00239 HSG

government's investigation, he is worried about his life (please see PSR paragraph 57 for details). Again, the government is doing its job in investigating its case, but the fall out will fall heavily on Mr. Ramirez-Castillo.

Finally, as explained in the PSR, the Judiciary Sentencing INformation (JSIN) platform (an online sentencing data resource that provides sentencing data for similarly situated defendants) noted that "[d]uring the last five fiscal years (FY2019-2023), there were 458 defendants whose primary guideline was §2D1.1 and Fentanyl was the primary drug type, with a Final Offense Level of 23 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 446 defendants (97%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 28 month(s) and the median length of imprisonment imposed was 24 month(s)." PSR ¶ 82. Mr. Ramirez-Castillo is certainly no worse than a person who would be sentenced to the median length of 24 months, and for all of the reasons stated in this Memorandum, there are a number of reasons that he is less culpable and has greater equities than the average person selling this quantity of fentanyl. A sentence of 19.5 months is thus fair under the type of sentence imposed nationally in similar cases.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests that the court sentence Mr. Ramirez-Castillo to time served, which is the equivalent of 19.5 months in custody.

DATED: January 16, 2025                    /s/ Shawn Halbert
                                           SHAWN HALBERT
                                           Attorney for Defendant Jair Ramirez-Castillo

-8-

SENTENCING MEMORADUM
CR 4:23-00239 HSG

# EXHIBIT A

SENTENCING MEMORADUM
CR 4:23-00239 HSG



US-002110



US-002109



US-002103